**MONROE BANKING & TRUST COMPANY, Plaintiff,**

v.

**Rufus Ben (Jack) ALLEN, Building Service Company, a corporation, and United States of America, Defendants.**

**No. EC–6532.**

United States District Court
N. D. Mississippi, E. D.
June 18, 1968.

Robert D. Patterson, Aberdeen, Miss., for Monroe Banking & Trust Co.

Thomas J. Tubb, West Point Miss., for Building Service Co.

H. M. Ray, U. S. Atty., Oxford, Miss., for United States of America.

### OPINION OF THE COURT

KEADY, Chief Judge.

This case poses for decision the priority of various claims, set out briefly as follows:

1. Claims of $10,658.92 asserted by Monroe Banking & Trust Company, plaintiff, to funds in the hands of defendant, Building Service Company, paid to it as prime contractor by owners under three separate contracts, for painting and related work which in each case had been subcontracted to Rufus Ben (Jack) Allen by Building Service Company, where Allen had assigned to the Bank all proceeds payable to him under said subcontracts as security for bank loans made to provide him with funds to perform the same;

2. Claims of Building Service Company to retain such funds based upon its asserted right to deduct from the assigned proceeds payable jointly to Allen and the Bank for materials sold by it to its subcontractor, Allen, in connection with the three jobs;

3. Claims of $3,884.03 asserted by the United States against the funds both previously paid to the Bank and those still retained by Building Service Company to satisfy tax liens arising against Allen on account of his failure to pay certain withholding taxes.

Plaintiff originally filed this action in the Chancery Court of Monroe County, Mississippi, against Allen, Building Service Company, and the United States of America. The case was removed to this Court by the government, pursuant to 28 U.S.C. § 1444. A cross-claim asserting the lien priority of the federal tax claim was filed against the Bank and Building Service Company. By separate answers, they denied the claims of the government to any portion of the funds in issue.

Allen did not contest the claims asserted by either the Bank of the United States, and suffered judgments to be taken against him.

The facts have been largely stipulated. Building Service, the general contractor for three separate construction contracts hereinafter mentioned, has received from the contracting owners all sums thereunder, and its subcontractor, Allen, has completed all work provided by the agreements made with him. Allen did not execute a bond to pay for his labor, materials, and equipment.

On August 22, 1961, Building Service Company subcontracted to Allen the painting and caulking on the Raspet Flight Laboratory job at a price of $6,-730.00. This subcontract was evidenced by written agreement between the two parties.[1] Allen applied to the Bank for a loan to finance labor and materials needed for the job. The Bank agreed to

---

1. Printed form of each subcontract contains this provision: "That no claim for services rendered or materials furnished by the Contractor (Building Service) to

the Subcontractor (Allen) *shall be valid unless written notice thereof is given by the Contractor to the Subcontractor during the first ten days of the calendar*

lend him a sum not in excess of 65% of the value of the subcontract, but on condition that the proceeds of the subcontract be assigned to the Bank as security for the loan. Allen delivered his subcontract to the Bank and on October 7, 1961, he executed a letter to Building Service Company authorizing it to "make all checks due me on the Raspet Flight Laboratory . . . payable both to myself and to Monroe Banking and Trust Company". After obtaining the signature of Allen thereon, the Bank forwarded this authority to Building Service Company, which agreed thereto by formal acceptance on October 9, 1961. Relying thereon, the Bank made various loans totaling $4,276.08 to Allen under this assignment, commencing in early October, 1961, and continuing for some months thereafter. Payments from Building Service and other sources reduced the loan balance to $267.83. On the Raspet job, Building Service Company made jointly to Allen and the Bank payments totaling $3,637.47, and withheld $3,092.53 to pay for materials sold by it to Allen and used on the job. These payments were made by check and were accompanied by statements of deductions for retainage [2] and for accounts purporting to be due Building Service, which were submitted to the Bank on April 23, 1962, on July 17, 1962, and on December 21, 1962. Some of these submissions by Building Service showed "less statement" and "less statement attached", but no statement showing the basis of the deductions to be the sale of materials to Allen was, in fact, ever submitted to the Bank. Moreover, all advances secured by the Raspet subcontract were made by the Bank before it received the first check and "statement" dated April 23, 1962. The Bank had no prior notice from building Service that it was selling materials on credit to Allen for use on the Raspet job or that it

intended to offset the materials account against payments due under the assigned subcontract.

On February 23, 1962, Building Service Company, as prime contractor, subcontracted to Allen the painting, labor and materials, on the Meats Research Laboratory job at a price of $7,385.00. Similar financing arrangements were made between Allen and the Bank as in the Raspet contract. On March 22, 1962, Allen executed a letter authorizing Building Service Company to remit all checks "due me on the Meats Research Lab. * * * payable both to myself and to the Monroe Banking and Trust Company * * *", which was agreed to and accepted by Building Service on March 23, 1962. On the basis of this acceptance the Bank made loans to Allen against this contract commencing in the month of March, 1962, and continuing for a period of some months thereafter, said loans aggregating $4,750.00, exclusive of renewals. Building Service Company paid to Allen and the Bank jointly two remittances under this subcontract totaling $4,536.63. The first remittance was made December 1, 1962, for $2,803.-63 and the final one on February 22, 1963, for $1,733.00, said payments being made by check and accompanied by statements. The first submission showed deductions for contract retainage and for an item of $2,848.37 designated "less account attached" but no statement showing the basis of this account to be the sale of materials by it to Allen was, in fact, submitted to the Bank. Although the payments made by Building Service Company almost equaled the aggregate loans made by the Bank on this job, there is a resulting balance due the Bank of $1,550.00, arising from its apparent failure to credit its loans with the entire payments received from Building Service. Again, the Bank had made all advances before

---

*month following that in which the claim originated."* (Emphasis added.) The evidence fails to show any such notice was given to the Bank.

2. The subcontract (in each case) referred to withholding a "retained percentage" of unspecified amount. Ten per cent was, in fact, deducted by Building Service, but this is of no consequence to the issues.

receiving from Building Service Company its first remittance and "statement". Prior thereto, the Bank had no notice that Building Service was selling materials on credit to the job and expected to offset its account against payments due by it under the subcontract.

On February 23, 1962, Building Service, again as prime contractor, subcontracted to Allen the painting on the Science Research Center job at a price of $18,000.00. On March 22, 1962, this contract was assigned to the Bank, with Allen executing a similar authority letter to Building Service Company authorizing it to "make all checks due me on the Science Research Center Building * * * payable both to myself and to Monroe Banking and Trust Company. * * * " This communication was, as were the two others, forwarded by the Bank to Building Service, which formally accepted same on March 23, 1962. On the basis of this acceptance the Bank made loans against this particular contract beginning in March, 1962, and on different dates thereafter for the balance of the year 1962, with recurring loans, exclusive of renewals, made almost each month of 1963 through August of that year. The original advances by the Bank on this job extended over a period of eighteen months with loans aggregating $13,650.00. The evidence does not disclose when Allen began work on this subcontract, or the schedule of its progress. Building Service made payments to Allen and the Bank jointly of only $3,952.45, credits from other sources having reduced the loan balance to $8,841.09. The remittances of Building Service Company were by checks accompanied by statements showing deductions for retainage and other purposes, but no statement was ever actually submitted to the Bank showing the basis for withholding funds to be the sale of materials by it to Allen. Building Service made its first payment on May 22, 1963, at which time its statement noted deductions for retainage and also of $2,679.49 for "account thru April 22, 1963". The second payment by Building Service was made on June 17, 1963, at which time there was deducted, in addition to retainage, $6,868.10 for "account thru May 23, 1963". On December 30, 1963, Building Service forwarded its statement to the Bank showing completion of the subcontract, with deductions as follows:

| | |
|---|---:|
| "Less Lynch Plastics, Inc. statement 8/12/63 | 152.63 |
| Less Science Research Center job statement attached | 3,629.01 |
| Less Balance on Personal account | 367.03 |
| Less Payment on Amory Housing Project account | 351.33" [3] |

The Bank had disbursed all but $2,400.00 of it's advances to Allen before receiving the first "statement" dated May 22, 1963. Prior thereto, the Bank had no actual notice that Building Service was selling materials on credit to the job and that it was expecting to offset any account Allen owed it against the subcontract proceeds. After receipt of this statement regarding deductions from Allen's account by Building Service, the Bank made advances as follows: $500.00 on May 24, 1963, $900.00 on June 18, 1963, and $1,000.00 on July 5, 1963.

Allen was at all times and still remains indebted to Building Service after crediting his account with the amount of $10,658.52 in dispute. Allen resided in Monroe County, where he conducted an enterprise known as Jack Allen Paint

---

3. In their brief, counsel for Building Service concedes it had no right to deduct for the two items, personal account $367.03, and Amory Housing Project $351.33.

Contractor. Building Service is a domestic corporation with its main office and principal place of business situated in Clay County.

Between the dates of December 14, 1962, and February 19, 1964, the Internal Revenue Service made four separate assessments against Allen for withholding taxes. Notices of these tax liens were filed in Monroe County, between the dates of April 24, 1963, and February 25, 1964. Building Service was served with notices of levy on October 25, 1963, for $1,522.98 in unpaid taxes of Allen, and on March 31, 1964, for $4,418.12, in unpaid taxes of Allen.

Building Service first asserts that, despite the assignments to the Bank, under Mississippi law it had a valid prime lien as materialman because of Allen's failure to make bond to assure his payment of materials purchased for the job. Reliance is placed upon Miss.Code Ann. § 373 (1942 Recomp.), which provides, in relevant part, that:

"No contractor or master workman except as hereinafter provided, shall have the right to assign, transfer, or otherwise dispose of in any way, the contract or the proceeds thereof, *to the detriment or prejudice of the subcontractors, journeymen, laborers, and materialmen as declared hereinabove* and all such assignments \* \* \* shall be subordinate to the said rights of the subcontractors, journeymen, laborers and materialmen, as well as the owner. Provided, however, that this section shall not apply to any contract or agreement where the contractor or the master workman shall enter into a solvent bond conditioned as provided for in the following section [This is a reference to § 374 of the 1942 Code]." (Emphasis added.)

 This contention is without merit for the reason that § 373 relates only to persons who are protected by § 372 of the Code. This latter section confers the right to acquire a lien upon any person furnishing materials or labor to "any contractor or master workman"

by giving "notice in writing to the owner \* \* \* of the amount due him and claim the benefit of this section; and, thereupon the amount that may be due \* \* \* by such owner . . . to the contractor or master workman, shall be bound in the hands of such owner" to satisfy the claim asserted. It is settled law that § 372 confers a lien by subrogation only to the rights of the contractor, and in order for a lien to arise and become fixed, there must first be written notice served upon the owner and at the time of his receipt of such notice the owner must be indebted to his contractor. Chancellor v. Melvin, 211 Miss. 590, 52 So.2d 360 (1951). The right to acquire a lien under § 372 is limited to persons engaged by the original contractor, and does not extend to others who supply materials or labor at the request of a subcontractor. Thus, remote materialmen, as is the status of Building Service here, are not so protected. Alabama Marble Company v. United States Fidelity & Guaranty Company, 146 Miss. 414, 111 So. 573 (1927); United States Fidelity & Guaranty Company v. Maryland Casualty Company, 191 Miss. 103, 199 So. 278 (1940). It is quite clear that §§ 372, 373, and 374 are interdependent and must be considered together as one plan of protection. A contrary result was reached by the Chancery Court of Monroe County, Mississippi, in Cause No. 15039 styled First National Bank of Aberdeen v. Allen, et al. In an unreported, unappealed decision, the Chancellor broadly held, on page 3 of his opinion, that: "Under our law where no performance bond is made by a contractor he cannot make a valid assignment which would defeat the rights of materialmen or laborers."

The Chancellor's error is apparent upon examination of the following passage in Alabama Marble Company at p. 574 of 111 So.:

"To put it in different words, the bond here, which the law provides may be given to take the place of the old mechanic's lien, or materialman's lien, was intended to guarantee pay-

ment only to the contractor or materialman who deals directly with the principal contractor."

The scope of § 373 in prohibiting certain assignments, is made plain not only by its express terms restricting it to the rights of laborers and materialmen "as declared hereinabove" (under § 372) and to the owner but also by § 374. A bond under § 374 obligates the person making the contract to faithfully perform it for the benefit of the owner and also to assure payment "to all persons furnishing labor or material under said contract".[4] Yet, the Supreme Court of Mississippi, in Alabama Marble Company v. United States Fidelity & Guaranty Company, supra, and United States Fidelity & Guaranty Company v. Maryland Casualty Company, supra, has expressly construed the statutory scope of such bond as not extending to labor and materials furnished subcontractors. The Supreme Court has stated that: "If the contractor does not give the bond provided by the statute [§ 374], laborers and materialmen have an equity [under present Code, § 372] * * * in the funds due the contractor by the owner of the building. * * * The purpose of the bond section of the statute [§ 374] was to provide for the protection of materialmen and laborers, the bond being in lieu of their equity in the funds arising out of the building contract." Dickson v. United States Fidelity & Guaranty Company, 150 Miss. 864, 117 So. 245, 248 (1928).

■■ Different considerations would be applicable if we were construing the rights of the parties to the proceeds of a public works contract supported by a contractor's bond under Miss.Code Ann. § 9014 (1942 Recomp.). Although the prime contracts made by Building Service were apparently for public constructions, the subcontracts between Building Service and Allen are wholly private contracts, and thus governed by the provisions of § 372 et seq. of the Code. Davis Co., Inc. v. D'Lo Guaranty Bank, 162 Miss. 829, 138 So. 802 (1932). It necessarily follows that Building Service, in its capacity as a supplier of material to its subcontractor, Allen, had no right to acquire a lien under § 372, and is not in position to invoke § 373 to invalidate the assignments made by Allen to the Bank.

Building Service next urges that it had the right to offset its materials account to Allen against funds remitted to the Bank because the Bank, as assignee, was charged with notice that Allen was obligated to furnish the material, labor and equipment as provided by the subcontracts and that the assignments were necessarily subject to that contractual obligation.

■ The general rule is that "an assignee of a nonnegotiable chose in action requires no greater rights than was possessed by his assignor, and simply stands in the shoes of the latter", 6 Am.Jur.2d, Assignments, § 102, p. 282. This rule is applicable to the assignee of the proceeds of a construction contract in the sense that he is bound by the terms of the contract to the same extent as his assignor. 13 Am.Jur.2d, Building

4. § 374 said Code, provides: "When any contractor or subcontractor entering into a formal contract with any person, firm or corporation, for the construction of any building or work or the doing of any repairs, shall enter into a bond with such person, firm or corporation guaranteeing the faithful performance of such contract and containing such provisions and penalties as the parties thereto may insert therein, such bond shall also be subject to the additional obligations that such contractor or subcontractor, shall promptly make payments *to all persons fur-* nishing labor or material under said contract; and in the event such bond does not contain any such provisions for the payment of the claims of persons furnishing labor or material under said contract, such bond shall nevertheless inure *to the benefit of such person furnishing labor or material under said contract,* the same as if such stipulation had been incorporated in said bond; and any such person who has furnished labor or materials used therein * * *." (Emphasis added.)

and Construction Contracts, § 92, p. 91. These general principles, together with the equitable limitations to be herein discussed, are recognized in Mississippi. We are cited to Hancock Bank of Gulfport v. G. E. Bass & Co., Inc., and United States Fidelity & Guaranty Company, 247 Miss. 274, 154 So.2d 278 (1963); and R. B. Tyler Company v. Laurel Equipment Company, 187 Miss. 590, 192 So. 573 (1940), but neither case is applicable to aid Building Service on the facts of this record.

In *Hancock Bank*, the assignment to the Bank of the proceeds of the subcontract was not accepted until after the subcontractor had incurred a pre-existing indebtedness to materialmen. That case stands for the proposition that the assignee of the proceeds of a contract may not recover to the detriment of one who is owed a debt by the assignor *which had become due before the assignment was made.*

*Tyler* is a somewhat closer case. R. B. Tyler Company, a general contractor, engaged one Broome to haul sand. Broome, who had no trucks and no funds, was furnished a letter by Tyler indicating its willingness to pay 50% of the amount due to Broome to the party selling the trucks and the other 50% to Broome. Laurel Equipment Company, relying on this letter, agreed by formal contract to sell Broome eight used trucks, specified for delivery on a certain date. After this delivery date of the trucks, as above specified, Broome gave Laurel Equipment Company a formal assignment of the proceeds payable to him by R. B. Tyler Company. The evidence showed that all but one of the trucks involved in the sale had been delivered to Broome and had been put to work before the assignment was served upon Tyler and that the assignment "went down about the time the last truck was taken down there". Tyler deducted from the proceeds paid to Laurel Equipment Company the sums paid out by Tyler each week for Broome's labor payroll, including truck drivers, for gasoline and oil used in operating the

trucks, and for truck repairs. The evidence showed that Laurel Equipment Company, the assignee, knew or should have known that Broome was otherwise unable to meet the necessary costs of operation, paid on this current basis, and that he could not have done the work at all without its being handled in the manner stated. On these facts, the Supreme Court of Mississippi concluded that Laurel Equipment Company had not relied upon an acceptance of the assignments as a basis of its transaction. The Court stated that: "The acceptance of the assignment by the obligor in the simple terms used in this case does not of itself create a new debt as between him [Tyler] and the assignee [Laurel Equipment Company]." *Tyler*, supra, at 575. However, the Supreme Court carefully pointed out what is to this Court a most significant limitation upon its holding:

"If, however, in the case before us, the assignee, first before making the sale and delivering the trucks to the assignor, had obtained the acceptance of the obligor to pay the assignee one half of the gross proceeds of the contract—had the assignee in making the sale and deliveries acted in reliance upon the acceptance of the assignment rather than upon the assignment itself —a different question would be presented; but the evidence shows that the sale and deliveries were made to the assignor before the acceptance, appellee's chief witness having testified, as already stated, that the last of the several trucks went down about the time the assignment was sent down. Reliance not having been placed upon the acceptance and delivery having been made before the acceptance, the legal effect of the acceptance was but an acknowledgment of notice of the assignment, and created no new or independent obligation." *Tyler*, supra, at 575.

In the present case the circumstances are quite different and fit more neatly into the above limitation than into the general rule. The Bank made certain that Building Service had accepted the

assignments before it, in fact, made any advances, and acted at all times in reliance upon the assignments as security for its loans. The Bank would not have made the loans to Allen without security of the contract proceeds, and it is fair to conclude from the course of dealings between the parties that Allen could not have performed his subcontracts without bank financing, a fact of which Building Service was quite aware.

■ Although an assignee's rights in the proceeds of a contract are ordinarily limited to such rights as the assignor had therein, such is not the case where another party to the contract, having accepted an assignment of the contract and knowing that the assignee is changing his position by relying thereon, creates, to the detriment of the assignee, additional obligations with the assignor. This equitable limitation applies here. The Supreme Court has held that: "Where a person knows of an assignment and either incurs additional obligations to the assignor or makes payment to him, or other persons, in preference thereto, he cannot escape liability to the assignee." Ewin Engineering Corp. v. Deposit Guaranty Bank & Trust Co., 216 Miss. 410, 62 So.2d 572, 576 (1953), citing four supporting Mississippi decisions.

■ It was encumbent upon Building Service to notify plaintiff Bank at the time of its acceptance of the assignments, that it proposed to make credit sales of materials to Allen and retain the right to deduct any such account from the assigned proceeds. The duty was upon Building Service to have made this unmistakably clear to the Bank as a condition to accepting the assignments, because it was the party to whom all funds would be paid for the work done by Allen as subcontractor. It would be inequitable to allow Building Service, which had no materialman's lien on these proceeds, and failed to require a performance bond from Allen, to remain silent and induce the Bank to make loans to enable Allen to perform subcontracts for the production of funds which had to first come into the hands of Building Service, as prime contractor, and then deduct its account before the Bank would have any right to any portion thereof. The subcontracts did not contain a clear and express reservation for Building Service first to pay its own account as materialman, and, absent such a clause, no right to do so would exist. Cf. First National Bank of Aberdeen v. Monroe County, 131 Miss. 828, 95 So. 726 (1923).

■ The record does not show facts which would preclude or estop the Bank from enforcing its assignments against those portions of the contract proceeds retained by Building Service. It did not accept the assignments until they were first approved by Building Service, and it made its loans to Allen in reliance thereon. Building Service knew that Allen had to have bank financing with which to perform the contracts, and while the Bank necessarily knew that Allen had to buy materials from someone, it had advanced all of the funds, except $2,400.00, to Allen in the regular course of business, before receiving information of any kind that Building Service was deducting for an indebtedness due it. With respect to the first "statement" of May 22, 1963, submitted on the Science Research Center contract, which was prior to the advancing of the last $2,400.00, the Bank was merely informed of a deduction referred to as "less Science Research Center job, statement attached, $3,629.01", with no statement being attached and without information of any kind imparting notice to the Bank as to the reason, or basis, for such deduction. Standing alone, that did not fairly inform the Bank that Building Service was asserting a prior right to deduct for materials sold by it to Allen on credit, and thereby impose upon the Bank a duty to cease financing. So far as the Bank knew, the deduction claimed by Building Service might have been a charge-back for unsatisfactory performance or other cause justified by the terms of the basic contracts between the owners and Building Service, to

which the subcontracts were expressly made subject. Withholding retainage, for example, was consistent with the plain terms of the subcontracts. The Bank was without negligence in the conduct of its business arrangements with Allen, and by accepting the checks which were remitted by Building Service under the circumstances disclosed by this record, it did not agree to settle its claim for less than what was due it. Under these circumstances there was no accord and satisfaction arising out of the Bank's mere acceptance of the checks.

 It, therefore, follows that the Bank's claim is prior to that of Building Service. This priority extends not only to the principal sum, but to accrued interest and attorney's fees thereon, as Building Service has retained funds sufficient to satisfy those items. The Bank's right to interest and attorney's fees is based upon the provisions of its notes, the validity of which has not been challenged by anyone. The effectiveness, therefore, of those provisions should not be defeated by the withholding by Building Service of funds under a mistaken view of its rights. Franklin Life Insurance Company v. Falkingham, 229 F.2d 300 (7 Cir. 1956).

 The government bases its claim for priority upon §§ 6321–6323 inclusive, of the Internal Revenue Code of 1954. § 6321, which is basic here, provides that one's failure to pay any tax will result in a lien upon "all property and rights to property * * * belonging to such person". The government's two-pronged argument for priority over the Bank with regard to its tax lien is as follows: It claims that the Bank's assignments due to their precise nature were not effective, thus leaving to Allen property rights in the proceeds, to which

the tax liens attached; it further claims that, although the Bank may have gained some interest in the proceeds, it still did not qualify as a mortgagee, pledgee or purchaser, under § 6323(a) so as to be protected prior to the filing of the lien notices in Monroe County, Mississippi, nor as the pledgee of a "security", under § 6323(c) (1), until it had actual knowledge of the tax lien. The government has conceded that no tax lien upon these proceeds could be valid as against Building Service, were it to prevail over the Bank, for the reason that Building Service was at all times owed by Allen a sum greater than the amount of the contract proceeds due him. Thus, Allen was admittedly without the right to compel payment from Building Service, and he personally had no "property" or "rights to property" in the proceeds of the subcontracts. See Miss.Code Ann. § 1481, 1942; Shapleigh Hardware Company v. Brumfield, 159 Miss. 175, 180, 132 So. 93 (1931); United States of America v. Raley Contracting Company, Inc., 210 F.Supp. 54 (E.D.D.C.N.M.) [Memorandum Opinion by Judge Claude F. Clayton dated August 6, 1962].

Having thus eliminated any tax lien claim to funds in the hands of Building Service, this Court is brought to consider the government's claim to certain funds previously paid to the Bank by Building Service and also funds adjudged to be payable to the Bank in this case.[5]

 Whether or not the government is entitled to priority in any amount depends entirely upon the effectiveness of the assignments to vest full title in the Bank to the proceeds of the subcontracts. The answer to this question must be determined by the law of this state. United States v. R. F. Ball Con-

---

5. The government's claims total $3,884.-03, which sum is divisible into two categories. The first category, consisting of the December 14, 1962, and April 8, 1963, assessments make up the amount of $1,-216.21 (balances of $332.01 and $884.20 respectively) claimed to be owing to the government in any event. The remaining $2,667.82 of the $3,884.03 total is contended by the government to be contingent upon this Court's holding Building Service liable to the Bank. In view of this Court's ruling, both claims must be dealt with.

212

struction Company, Inc., 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958); Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); United States of America v. Raley Contracting Company, Inc., supra, 210 F.Supp. 54.

■ There is ample authority among the Mississippi decisions to establish that the financial arrangements disclosed by this record constituted equitable assignments which were valid and binding upon all parties. The substantive acts of the parties indicate that they all intended that Allen would be deprived of any interest in the proceeds until the Bank had been paid in full. It is clear that the Bank proposed and carried out its agreement to lend up to 65% of the value of the subcontracts; the subcontracts were manually delivered by Allen to the Bank; and the Bank did not proceed to make any loans until Allen had executed the letters of authority and had same accepted by Building Service. All of these arrangements were understandingly and purposely made by the interested parties, showing an intention consistent with vesting in the Bank an ownership of the subcontracts' proceeds to the extent of its advances.

■ In Mississippi, the assignee of a non-negotiable chose in action is invested with an equitable title by delivery alone, which the courts of law will protect. Simmons v. Smith County Bank, 225 Miss. 384, 83 So.2d 441 (1955); Anaconda Aluminum Company v. Sharp, 243 Miss. 9, 136 So.2d 585, 99 A.L.R.2d 1307 (Miss.1962). These cases align Mississippi with the general rule that "the true test of an equitable assignment is whether the debtor would be justified in paying the debt to the person claiming to be the assignee". 6 Am.Jur.2d, Assignments, § 83, p. 266. Under state law there was a valid, equitable assignment of the proceeds of each of the three subcontracts. The circumstances surrounding the transaction and the legal effect thereof are undisputed by the assignor, assignee and the obli-

gor, and questioned only by a stranger to the transaction. At no time subsequent to the effective date of any of the three assignments could Jack Allen have had any property rights in a legal sense in such proceeds until the Bank was first satisfied. Moreover, from an economic standpoint these subcontracts, without bank financing, represented nothing of present value to Allen, and it was the Bank's advances which enabled any funds whatsoever to be realized upon the subcontracts. The position of the government is without any appeal, particularly because all three subcontracts had been made, the proceeds assigned to the Bank, and the Bank had made all its advances on the first two jobs and substantial advances on the last job, before the assessment against Allen of the oldest tax liability, an event which did not occur until December 14, 1962.

■ Service Fire Insurance Company of New York v. Reed, 220 Miss. 794, 72 So.2d 197 (1954), strongly relied upon by the United States, is clearly distinguishable on its facts. A very brief sketch of the factual situation in Service Fire will illustrate its inapplicability. An automobile purchased by one Reed, partially financed by Universal C.I.T. Corporation, and insured by Service Fire Insurance Company, was destroyed by fire shortly after it was purchased. Reed signed a proof of loss containing a release which required Service Fire to pay Universal C.I.T. (the agent of Service Fire) the balance owing it by Reed and a small garage bill owed by Reed. Reed later filed suit asking for the actual cash value of his car, less the amount paid for his account. The jury returned a verdict for $600.00 and judgment was entered against Service Fire for that amount. Service Fire's appeal involved a contention that Reed had no interest in the lawsuit because he had assigned his interest to Furchess Motor Company, and placed reliance upon a letter from Reed to Universal C.I.T. requesting it to "make the coverage on my account payable to Furchess Motor Com-

pany * * * and mail the check to them so that it may apply on another car as a down payment". 72 So.2d 197, 199 (Miss.1954). The court held that the assignment was invalid, stating it was nothing more than a direction to pay over the check. In the case at Bar, however, the Bank has much more solid ground upon which to rely than the mere words of Allen. In Service Fire, the purported assignor did not relinquish control, but here, a check payable to Allen and the Bank jointly would have been without value to Allen, except with the Bank's endorsement. The purported assignee in Service Fire did not assume any control of the chose in action, but here the Bank made clear through the words and acts of its officers that it considered itself entitled to full control over the proceeds of the subcontracts, at least until its advances to Allen had been repaid. Thus, it is clear that the mere fact that Allen was named as one of the payees does not, as urged by the government, make him vested with a property right, to the derogation of the unsatisfied rights of the Bank.

■ There being no property or rights to property remaining in Allen subsequent to the dates of the respective assignments, the government's claim must fail. There is thus no need to enter the province of federal law, since an interpretation of § 6323(a) and (c) (1) is to be resorted to only after there is an initial determination that the tax payer had "property rights" to which a tax lien might attach. Morgan v. Commissioner of Internal Revenue, 309 U.S. 78, 626, 60 S.Ct. 424, 84 L.Ed. 585, 1035 (1940); United States v. Colotta, 350 U.S. 808, 76 S.Ct. 82, 100 L.Ed. 725 (1955); United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958).

Counsel for plaintiff shall prepare a decree in accordance with this opinion and the relief prayed for in the complaint will be granted. The plaintiff is entitled to a judgment against Building Service Company in the principal amount of $10,658.92, plus six percent per annum interest accrued from due date, and ten percent attorney's fees thereon; the cross-bill of the United States of America is dismissed as to both the bank and Building Service. Costs will be taxed two-thirds to Building Service Company and one-third to the United States of America.